IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Larry Charles Furr, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>Carolyn W. Colvin, Acting )<br>Commissioner of Social Security,[1] )<br>)<br>Defendant. )<br>_____ ) | Civil Action No. 6:13-1229-RMG-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff, who is proceeding *pro se*, brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on March 2, 2011, alleging that he became unable to work on March 1, 2010.  He filed an application for supplemental security income ("SSI") benefits on January 12, 2012. The applications were denied initially and on reconsideration by the Social Security

---

[1]  Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013.  Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

Administration.  On September 14, 2011, the plaintiff, who was represented by an attorney, requested a hearing.  The administrative law judge ("ALJ"), before whom the plaintiff, his attorney, and Celena Earl, an impartial vocational expert, appeared on September 26, 2012 (Tr. 37), considered the case *de novo*, and on November 2, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  At the hearing, the claimant amended the alleged onset date to October 3, 2011, his 55th birthday. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on March 19, 2013.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

(2)    The claimant has not engaged in substantial gainful activity since October 3, 2011, the amended onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe impairments: varicose veins and decreased visual acuity (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925, and 416.926).

(5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) except that the claimant is limited to occasional tasks that require far visual acuity.

(6)    The claimant is capable of performing past relevant work as a customer service representative.  This work does not require performance of work-related activities precluded by the

2

claimant's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

(7)    The claimant has not been under a disability, as defined in the Social Security Act, from October 3, 2011, the amended onset date, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

3

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

4

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

In May 2010, the plaintiff underwent a number of tests of cardiac and vascular function (Tr. 272-75). Specifically, the plaintiff's echocardiogram, arterial stiffness index ("ASI"), carotid ultrasound ("CUS"), and ankle brachial index ("ABI") were only mildly abnormal whereas his ejection fraction, electrocardiogram ("EKG"), and abdominal aortic ultrasound were normal (Tr. 272-75).

In November 2010, the plaintiff underwent additional cardiac and vascular function testing. At that time, the plaintiff's echocardiogram and CUS were only mildly abnormal whereas his ASI, ABI, ejection fraction, EKG, and abdominal aortic ultrasound were all normal (Tr. 278-79, 281-82). An osteoporosis screen of the plaintiff's right foot revealed that he had below average bone density (Tr. 281).

In May 2011, the plaintiff underwent additional cardiac and vascular function testing (Tr. 288-92). At that time, the plaintiff's echocardiogram and CUS were only mildly abnormal whereas his ASI, ABI, ejection fraction, EKG, and abdominal aortic ultrasound were all normal (Tr. 288-92).

In May 2011, Dr. Sushil Das, M.D., conducted a consultative physical examination on the plaintiff (Tr. 305-06). The plaintiff reported that his relevant medical conditions included (1) artery/vein disease, which he alleged had caused pain since March 2010, but that he had not received treatment for this condition due to a lack of money; (2) bone disease, which he reported was based on an abnormal bone density test; (3) skin disease, which was based on discoloration of both legs for the past year and some spider

5

varicose veins; (4) irregular heartbeat, for which he had taken medication for several years that controlled his heart palpitations; (5) high cholesterol, which had been controlled with medication over the past two years; (6) prehypertension, which did not require any medication and had not been diagnosed as hypertension; (7) high triglycerides, for which he took medication; (8) acid reflux, for which he had taken medication over the past two to three years; (9) swelling in his legs, for which he used compression hose that helped his symptoms; and (10) a bacterial infection, which he claimed was located in his heart (Tr. 305). Dr. Das remarked that the plaintiff had "a lot of vague problems" upon hearing his subjective complaints (Tr. 305). Upon examination, Dr. Das noted that the plaintiff was able to walk and climb on and off the examining table without any difficulty and that the plaintiff's motor strength, sensation, and straight leg raising tests were normal. Dr. Das further noted that the plaintiff had only very slight swelling in his legs and only mild varicose veins, which were worse on the right side than the left. Dr. Das also noted that the plaintiff had a very good physique. Dr. Das reported that the plaintiff had "a lot of vague complaints" with the main problem being his spider varicose veins that allegedly caused him pain. He noted that the plaintiff was wearing compression hose to treat his spider varicose veins, which was the proper treatment for that condition. Dr. Das indicated that the plaintiff's other reported medical conditions (bone disease, skin disease, irregular heartbeat, high cholesterol, prehypertension, high triglycerides, acid reflux, etc.) were only minor problems for him. Dr. Das opined that the plaintiff was able to perform normal physical activity without any functional limitations (Tr. 306).

In June 2011, Ted J. Roper, M.D., a state agency reviewing physician, opined that the plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. He also opined that the plaintiff could not perform jobs that required constant visual acuity for safety or accuracy (Tr. 62-70). Matthew Fox, M.D., a

6

state agency reviewing physician, essentially affirmed Dr. Roper's opinion in August 2011, except that he found that the plaintiff was limited to performing tasks requiring fine discrimination of small objects at a distance no more than frequently (Tr. 72-81).

In October 2011, the plaintiff presented to Mark Ciminelli, M.D., a cardiologist, with complaints of intermittent chest discomfort and heart palpations. Upon physical examination, Dr. Ciminelli noted that the plaintiff had some mild swelling and decreased pulse in both legs. Based on his examination, Dr. Ciminelli recommended that the plaintiff undergo testing for peripheral vascular disease. Dr. Ciminelli also noted that the plaintiff was tolerating treatment for high cholesterol well (Tr. 319-21).

In November 2011, the plaintiff presented to the Springs Memorial Hospital emergency room after twisting his ankle and falling (Tr. 330-31, 334). The plaintiff reported that he was experiencing pain in his left foot and ankle (Tr. 330). Upon physical examination, it was noted that the plaintiff had some mild to moderate swelling and tenderness to palpation in his left foot and ankle, but that the remainder of the examination was within normal limits (Tr. 332). An x-ray of the plaintiff's left foot and ankle revealed that he did not have any acute fracture or dislocation (Tr. 332, 335, 336). The plaintiff was diagnosed with a left heel contusion and was discharged to home in stable, improved condition (Tr. 333).

In December 2011, the plaintiff told Dr. Ciminelli that he had not experienced any chest discomfort, swelling in his legs, or heart palpations since his prior visit. Dr. Ciminelli's physical examination findings were largely normal, except for some mild swelling in the plaintiff's legs. Dr. Ciminelli again noted that the plaintiff was tolerating high cholesterol treatment well (Tr. 323-24).

In January 2012, the plaintiff told Dr. Ciminelli that he had not experienced any chest discomfort or heart palpitations since his prior visit. The plaintiff's sole complaint at that time was that he was experiencing swelling in his legs, which he characterized as

7

moderate to severe.  Dr. Ciminelli's physical examination findings were largely normal, except for some mild swelling in the plaintiff's legs.  Dr. Ciminelli noted that the swelling in the plaintiff's legs had improved since his last visit.  He also noted that the plaintiff needed to undergo testing related for peripheral vascular disease, but he refused due to lack of insurance.  Dr. Ciminelli also noted that the plaintiff's depression had worsened, and he added a prescription for Celexa (Tr. 325-26).

In August 2012, the plaintiff told Dr. Ciminelli that he had not experienced any recent chest discomfort, swelling in his legs, or heart palpations.  The plaintiff, however, complained that his legs were giving out at times, which caused him to fall some.  Dr. Ciminelli's physical examination findings were largely normal.  In particular, Dr. Ciminelli noted that the plaintiff did not have any swelling in his legs and that his swelling had improved since his last visit.  Dr. Ciminelli noted that the plaintiff's hypertension was benign and adequately controlled and that the plaintiff was tolerating high cholesterol treatment well.  He further noted that the plaintiff denied depression (Tr. 327-28).

***Plaintiff's Testimony***

At the administrative hearing, the plaintiff testified that he stopped working as a customer service representative due to poor performance, which he attributed to having to take longer breaks (Tr. 52).  The plaintiff testified that he experienced pain and swelling in his legs, which made it difficult to stand or sit for long periods of time.  The plaintiff alleged that his legs would begin to swell after sitting or standing for 15 to 20 minutes (Tr. 53-54).  He testified that he tried to elevate his legs every 30 minutes for 15 to 20 minutes a time (Tr. 55).  He also testified that he wore compression socks that were effective in relieving the swelling in his legs, but not his pain symptoms.  The plaintiff reported that he only took over-the-counter aspirin to treat his pain symptoms.  The plaintiff also testified that he had blurry vision (Tr. 45-46).

8

***Vocational Expert's Testimony***

At the administrative hearing, the ALJ described an individual of plaintiff's age, education, and work experience who was limited to performing a range of medium work that required no more than occasional tasks that require far visual acuity. The vocational expert testified that such an individual would be capable of performing the plaintiff's past relevant work as a customer service representative. The vocational expert also testified that such an individual would be capable of performing other jobs in the national economy including jobs as an automobile detailer, kitchen helper, and sandwich maker (Tr. 57-58).

## ANALYSIS

The plaintiff was 55 years old on his amended alleged onset date and was 56 years old on the date of the ALJ's decision. The plaintiff attended four years of college, but he did not obtain a degree (Tr. 177, 305). He has past relevant work experience as a customer service representative (Tr. 25, 56, 177).

The plaintiff argues that the ALJ erred (1) in his findings at step two of the sequential evaluation process; (2) by misstating evidence related to his peripheral vascular disease; (3) by failing to order that he undergo a second consultative physical examination; (4) by failing to impose a functional limitation regarding his need to elevate his legs to account for his varicose veins and/or peripheral vascular disease; and (5) by misstating the evidence when he stated that "the claimant was tolerating lipid lowering therapy well."[3]

---

[3] In his reply brief, the plaintiff also argues that the ALJ erred by failing to include a limitation as to his near visual acuity rather than just his far visual acuity (pl. reply at 4). However, as this argument was not raised in his initial brief, it is waived. *See Anderson v. Dep't of Labor*, 422 F.3d 1155, 1174, 1182 n. 51 (10th Cir. 2005) (because plaintiff did not raise an issue in his opening brief, it is waived). Furthermore, even if the court considered this argument, substantial evidence supports the ALJ's finding that the plaintiff should only be limited to occasional tasks that require far visual acuity (Tr. 22). The ALJ gave "great weight" to the opinions of State agency physicians Drs. Roper and Fox. Specifically, Dr. Roper opined that the plaintiff could not perform jobs that required constant visual acuity for safety or accuracy (Tr. 62-70), and Dr. Fox found that the plaintiff was limited to no more than frequently performing tasks requiring fine discrimination of small objects at a distance (Tr. 72-81). The plaintiff has cited no opinion from a treating physician stating that the plaintiff's visual impairment is more limiting than found by the ALJ.

The plaintiff further argues that the Appeals Council failed to consider additional medical evidence submitted after the date of the ALJ's decision.

### Residual Functional Capacity

The ALJ found that the plaintiff had the residual functional capacity ("RFC") to perform medium work, which involves lifting and carrying 50 pounds occasionally and 25 pounds frequently, standing and/or walking for up to six hours in an eight-hour workday, and sitting for up to six hours in an eight-hour workday, except that he was limited to occasional tasks that require far visual acuity (Tr. 22). *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (defining "medium work"). The ALJ further found that the plaintiff was capable of performing his past relevant work as a customer service representative (Tr. 25). In the alternative, the ALJ further found that there were other jobs that exist in significant numbers in the national economy that the plaintiff could perform, including automobile detailer, kitchen helper, and sandwich maker (Tr. 26).

The ALJ's RFC finding is supported by the medical source opinions of the state agency reviewing physicians, Drs. Roper and Fox, who both opined that the plaintiff was capable of performing a range of medium work with visual acuity limitations(Tr. 24; *see* Tr. 67-69, 77-79). The ALJ's RFC finding is also supported by the opinion of Dr. Das, the consultative examining physician, who opined that the plaintiff was able to perform normal physical activity without limitations (Tr. 24; *see* Tr. 306). Although the ALJ ultimately determined that the plaintiff was more functionally limited than as assessed by Dr. Das, Dr. Das's opinion nonetheless supports the ALJ's ultimate conclusion that the plaintiff was not disabled as a result of his impairments (Tr. 24).

The ALJ's RFC finding is also supported by the objective medical evidence of record. Specifically, the ALJ noted that (1) the plaintiff's cardiac function testing results were consistently either normal or only mildly abnormal (Tr. 24; *see* Tr. 272-75, 278-82, 288-92); (2) the medical records consistently indicated that the plaintiff was not in any

10

distress during his examinations (Tr. 24; *see* Tr. 294, 305, 332); and (3) the plaintiff's physical examination findings were regularly normal (including full strength, full sensation, and the ability to walk and climb on and off the examination table without difficulty), except for some swelling in his hands and legs and decreased pulse on one occasion (Tr. 24; *see* Tr. 306, 320, 323-24, 326, 328, 332). The ALJ also noted that the medical records indicated that the plaintiff's swelling had improved with treatment (Tr. 24; *see* Tr. 326).

The ALJ also noted that medical evidence indicated that many of the plaintiff's allegedly disabling conditions were either well-controlled with medication or did not produce any significant symptoms (Tr. 21). For example, the medical evidence indicated that the plaintiff's irregular heartbeat, hyperlipidemia, high cholesterol, valvular heart disease, and gastroesophageal reflux disease were well-controlled with medication (Tr. 21; *see* Tr. 301, 305, 320, 324, 326, 328). The ALJ further noted that the plaintiff had not alleged, nor did the medical records show, any significant symptoms derived from his high blood pressure, bone disease, high triglycerides, or high cholesterol (Tr. 21). Furthermore, Dr. Das recognized during his consultative examination that the plaintiff's "bone problem, skin problem, irregular heartbeat, cholesterol, prehypertension, triglycerides, acid reflux, etc., are minor problems for him" that did not cause any functional limitations (Tr. 306).

Based upon the foregoing, substantial evidence supports the ALJ's RFC finding. The plaintiff's particular allegations of error will be discussed below.

### *Peripheral Vascular Disease*

First, the plaintiff appears to challenge the ALJ's step two finding that the plaintiff's varicose veins and decreased visual acuity were severe impairments (Tr. 20-22; *see* pl. brief at 2). The plaintiff argues that "varicose veins are a form of peripheral vascular disease" (pl. brief at 2). Apparently, the plaintiff contends the ALJ erred by failing to find that his peripheral vascular disease was a severe impairment. Assuming that varicose veins are a form of peripheral vascular disease as the plaintiff contends, the ALJ

11

nonetheless explicitly accounted for the physical limitations resulting from this impairment and its symptoms of pain, swelling, and occasional claudication – regardless of how it was characterized – when he found that the plaintiff's varicose veins were a severe impairment that limited him to performing a range of medium work (Tr. 20-25).   The ALJ explicitly stated that, even though he determined that the plaintiff did not have the medically determinable impairment of peripheral vascular disease, he nonetheless "considered the claimant's complaints regarding pain and swelling [allegedly caused by his peripheral vascular disease] to the extent they might be explained by his varicose veins" (Tr. 22).  The plaintiff does not attempt to explain how characterization of his impairment as peripheral vascular disease rather than varicose veins would affect the ALJ's RFC finding, nor does he point to any medical evidence suggesting that he would have had more extensive functional limitations if his impairment had been characterized as peripheral vascular disease.

        If an ALJ commits error at step two, it is rendered harmless so long as the ALJ properly concludes that the claimant cannot be denied benefits at step two, but rather continues to the next step of the sequential evaluation process. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (holding that any error at step two of the sequential evaluation process becomes harmless if the ALJ "reached the proper conclusion that [the claimant] could not be denied benefits at step two and proceeded to the next step of the evaluation sequence").  Here, the ALJ found the plaintiff had severe impairments and proceeded to the next step of the sequential evaluation process.   Accordingly, any allegation of error in this regard is harmless.

        The plaintiff also argues that the ALJ misstated evidence related to his peripheral vascular disease (pl. brief at 2-3).  Specifically, he takes issue with the following statement by the ALJ: "In October 2011, Dr. Mark Ciminelli, a cardiologist, listed peripheral vascular disease under the 'impression and plan' section of his notes.  However, he also

indicated that the claimant would need ABI[4] testing done to confirm this" (pl. brief at 2-3 (citing Tr. 22)).  The plaintiff argues that Dr. Ciminelli's treatment notes did not state that testing needed to be done "to confirm" a diagnosis of peripheral vascular disease; rather, the notes simply state that testing was "to be done at a later date as an outpatient" (pl. brief at 2 (citing Tr. 320)).

　　　　　　Here, the ALJ found that the plaintiff did not "have the medically determinable impairment of peripheral vascular disease, as that diagnosis was merely suspected and not confirmed" (Tr. 22).  The ALJ further noted that the plaintiff did not have the recommended ABI testing done due to lack of insurance (*id.*).  During the process of evaluating whether a claimant is disabled, the ALJ considers whether the claimant has any medically determinable physical or mental impairments that could reasonably be expected to produce the pain or other symptoms alleged. *See* 20 C.F.R. §§ 404.1529(b), 416.929(b). Medically determinable impairments must be demonstrated through medical signs and laboratory findings established by medically acceptable clinical or laboratory diagnostic techniques, not merely the claimant's statements alone. *See* 20 C.F.R. §§ 404.1528(a), 404.1529(a)-(b), 416.928(a), 416.929(a)-(b). In this case, the ALJ reasonably found that the plaintiff's alleged peripheral vascular disease was not a medically determinable impairment because it had not been confirmed with sufficient medical signs and laboratory findings (Tr. 22).  Specifically, the ALJ noted that the plaintiff had not undergone any recent ABI testing, and prior ABI testing results from November 2010 and May 2011 were normal (Tr. 22; *see* Tr. 279, 281, 289, 292, 320).　　Accordingly, this finding was based upon substantial evidence.  Moreover, as discussed above, the ALJ nonetheless explicitly considered the plaintiff's alleged symptoms of pain and swelling that the plaintiff attributed to peripheral

_____

[4] "The ABI compares the blood pressure in the arms to the blood pressure in the lower extremities, specifically, the ankle pressures.  The ankle pressure should be the same or slightly higher than the arm pressure.  If the ankle pressure is significantly lower than the arm pressure then it is suggestive of Peripheral Artery Disease" (Tr. 289).

vascular disease to the extent that the symptoms might be explained by his varicose veins, which the plaintiff himself acknowledges is a form of peripheral vascular disease (Tr. 22). Because the ALJ explicitly considered the symptoms that the plaintiff attributed to peripheral vascular disease when making his RFC determination, this allegation of error is without merit.

### Consultative Examination

The plaintiff next contends that the ALJ should have ordered that he undergo a second consultative physical examination in addition to the consultative physical examination conducted by Dr. Das (pl. brief at 3). An ALJ is not required to order that a claimant undergo a consultative examination unless "the evidence as a whole is insufficient to support a decision." *Bishop v. Barnhart*, 78 F. App'x 265, 268 (4th Cir. 2003); *see also* 20 C.F.R. §§ 404.1517, 404.1519a(b), 416.917, 416.919a(b) (A consultative examination may be purchased "when the evidence as a whole is insufficient to support a determination or decision on your claim."). Furthermore, "the ALJ has discretion in deciding whether to order a consultative examination." *Bishop*, 78 F. App'x at 268. The plaintiff contends that because the ALJ gave only "some weight" to Dr. Das's consultative opinion (due to his failure to take into account the plaintiff's subjective reports of pain and decreased vision) (Tr. 24), the ALJ was required to send him for another consultative examination (pl. brief at 3). However, the mere fact that the ALJ only attributed some weight to Dr. Das's consultative opinion – in favor of more restrictive functional limitations that benefitted the plaintiff – does not require the ALJ to send the plaintiff to a second consultative examination. *See Clontz v. Astrue*, No. 2:12-cv-13-FDW, 2013 WL 3899507, at *7 (W.D.N.C. July 29, 2013) (rejecting claimant's argument that a consultative examination was required because the ALJ attributed only some weight to the medical source opinion evidence of record). Here, there was sufficient evidence in the record for the ALJ to make a disability determination, and that decision was supported by substantial evidence.

Therefore, there was no need for another consultative examination.  Accordingly, this allegation of error is without merit.

### Functional Limitation

The plaintiff next contends that the ALJ should have imposed a functional limitation regarding his need to elevate his legs (pl. brief at 3).  However, the ALJ explicitly found that a functional limitation was not supported by the medical evidence of record (Tr. 27).  As the ALJ noted, there is no indication in the record that the plaintiff's treating cardiologists ever instructed him to elevate his legs in order to treat any physical impairment[5] (id.).  Furthermore, Dr. Das, the consultative examiner, as well as Drs. Roper and Fox, the state agency reviewing physicians, opined that the plaintiff did not require any functional limitations regarding the elevation of his legs during the workday (Tr. 68-69, 77-79, 306).  Thus, the record is devoid of any medical source opinions indicating that the plaintiff was required to elevate his legs in order to account for his varicose veins and/or peripheral vascular disease. As such, this allegation of error is without merit.

### Misstatement of the Evidence

The plaintiff next claims that the ALJ misstated the evidence when he stated that "the claimant was tolerating lipid lowering therapy well" (pl. brief at 4 (citing Tr. 21)). However, contrary to the plaintiff's argument, the ALJ's statement directly mirrors Dr. Ciminelli's treatment notes, in which he routinely indicated that "[the plaintiff] is tolerating lipid lowering therapy well" (Tr. 320, 324, 326, 328).  The plaintiff appears to contend that the ALJ misstated the evidence simply because Dr. Ciminelli did not conduct any diagnostic lipid testing (pl. brief at 4). However, the plaintiff fails to explain why he believes that a lack

---

[5]As argued by the Commissioner, the ALJ accurately noted that the plaintiff was instructed to rest, ice, and elevate his left foot in order to treat a heel contusion suffered in November 2011 (Tr. 27; see Tr. 333); however, the ALJ recognized that this recommendation was intended to treat the plaintiff's temporary heel contusion injury, not his varicose veins, and, therefore, no such functional limitation was necessary in the RFC finding (Tr. 27).

of diagnostic lipid testing in any way undermines the ALJ's and Dr. Ciminelli's statement that he was tolerating lipid lowering therapy well. Dr. Ciminelli's treatment notes, along with the fact that there is no medical evidence whatsoever indicating that the plaintiff had any functional limitations as a result of hyperlipidemia, provided substantial support for the ALJ's finding that the plaintiff's hyperlipidemia was not a severe impairment and did not cause any functional limitations in excess of those contained within the RFC finding (Tr. 21; *see* Tr. 67-69, 77-79, 306, 320, 324, 326, 328). Accordingly, this allegation of error is without merit.

### Appeals Council Evidence

The plaintiff argues that the Appeals Council erred in failing to properly consider certain evidence submitted after the ALJ's decision (pl. brief at 4-6). "In reviewing decisions based on an application for benefits, if new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. §§ 404.970(b), 416.1470(b. *See Meyer v. Astrue*, 662 F.3d 700, 704-05 (4th Cir. 2011). The regulations also provide that, "[i]f you submit evidence which does not relate to the period on or before the date of the administrative law hearing decision, the Appeals Council will return the additional evidence to you with an explanation as to why it did not accept the additional evidence and will advise you of your right to file a new application." 20 C.F.R. §§ 404.976(b)(1), 416.1476(b)(1).

The ALJ's decision covered the period of time from October 3, 2011, the plaintiff's alleged disability onset date, through November 2, 2012, the date of the ALJ's decision. The additional medical evidence submitted by the plaintiff to the Appeals Council (*see* Tr. 4) includes the following:

> • A treatment note from Dr. Charles W. Harris, M.D., dated December 8, 2010, stating that he told the plaintiff to use "Ace bandages when legs are dependent and socks over these,

16

remove them when these legs are not dependent" (pl. brief, ex. J);

• A treatment note from Dr. Harris, dated December 18, 2012, stating that the plaintiff "requires leg elevation" for major venous insufficiency (*id.*, ex. M);

• A treatment note from Dr. Ciminelli, dated February 1, 2013, stating that the plaintiff "needs to continue leg evaluation" (*id.*, ex. N); and

• A treatment note from Dr. Joseph Chapman, M.D., dated February 28, 2013, stating that the plaintiff most likely has diffuse peripheral neuropathy (*id.*, ex. O).

As argued by the Commissioner, none of the foregoing evidence relates to the relevant period of time that was adjudicated within the ALJ's decision, October 3, 2011 through November 2, 2012. Notably, the treatment note from Dr. Harris dated December 8, 2010, precedes the plaintiff's alleged disability onset date by approximately ten months and does not contain any indication of any functional limitations that might have persisted into the relevant time adjudicated by the ALJ. Similarly, the remaining treatment notes from Drs. Harris, Ciminelli, and Chapman all post-date the date of the ALJ's decision, and none of these treatment notes speak to the plaintiff's condition during the relevant time period on or before the date of the ALJ's decision. Accordingly, the Appeals Council reasonably found that this evidence did not affect the ALJ's decision as to whether the plaintiff was disabled from October 3, 2011, to November 2, 2012, and, therefore, properly returned such evidence[6] to the plaintiff and advised him of his right to file a new application for benefits in accordance with the regulations (Tr. 4).

As pointed out by the plaintiff, the Appeals Council mistakenly stated that November 2, 2012, was the plaintiff's date last insured for disability benefits, rather than the

---

[6]The Appeals Council did incorporate certain evidence submitted by the plaintiff into the record (Tr. 4, 7). This evidence consists of the plaintiff's contentions, an article on peripheral neuropathy, an appointment reminder dated August 31, 2012, a medication list dated November 29, 2011, and excerpts from a dictionary (Tr. 7, 221-66, 337-70).

date of the ALJ's decision, in its notice denying the plaintiff's request for review (pl. brief at 5-6; *see* Tr. 4). However, because the relevant period of time at issue is from October 3, 2011, until November 2, 2012, regardless of the Appeals Council's misstatement about the nature of the latter date, the Appeals Council's misstatement is nothing more than harmless error.

Based upon the foregoing, this allegation of error is without merit.

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

June 27, 2014
Greenville, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
300 East Washington Street
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).